# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

Case No._____- Civ

FILED BY_____D.C.

OCT 1 4 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

Primous Fountain,
Plaintiff,

vs.

Michael Tilson Thomas, New World Symphony, Inc, Martin Sher,
Defendants

# OVERVIEW

In January 2020 a legally binding agreement was entered into between
Plaintiff PRIMOUS FOUNTAIN, and Defendants Michael Tilson Thomas
(MTT) and the orchestra NEW WORLD SYMPHONY (NWS). Thomas
and the orchestra, with this agreement, intended to celebrate the music of
Fountain in a concert devoted exclusively to Fountain's work (music
compositions). This concert had been scheduled and publicly announced by
the NWS for their 2021-22 season. (See Annexure A) Public announcement
of the concert. (All annexures are attached at the end of the document).
Thomas is co-founder and then music director, now artistic director
laureate, of the NWS. The agreement was explicit, implied and oral
established.

On June 22, 2020 conductor Michael Tilson Thomas phoned Fountain -
excitingly telling Fountain over and over again how original his music is -
and he offered to Fountain to conduct a concert with the NWS exclusively
of Fountain's music. Fountain agreed. [See Annexure B – Showing an
Agreement had been made.].

This concert had been in on-going planning between all Defendants and
Plaintiff for two years. The concert was scheduled and publicly announced
for April 16, 2022. Thomas and the NWS entitled the concert,
**"Primous Fountain: An American Original"**.

Later the Defendants tried to contrive the fact that they had to postpone the concert, that they were legally bound to continue with, attempting to misled the Plaintiff to think by alluding that due to heath reasons the concert was to be **"Postponed".** (Annexure C) The fraudulent misrepresentation was constituted here because Thomas was continuing conducting then and up to this date despite implying to Fountain that the music director Thomas could not conduct concerts dues to health reason **(When it came to conducting the concert that was agreed between Thomas, the NWS and Fountain).** In fact, Thomas was far in advance scheduled to conduct, and did conduct, the NWS in three concerts that following 2022-23 season in which Fountain concert was (led to believe) to be postponed to, but was not given. (See Annexure D, D1)

Leaving Fountain's work to date not performed in the USA for over 40 years which Thomas and the NWS was well aware of.

Composing music has been the only work Fountain has done for a living since leaving high school in Chicago, where Foutain was raised in Chicago's Southside Ida B. Wells Housing Projects.

# I. PRELIMINARY STATEMENT

This Complaint arises from a deliberately breached agreement to present a full concert of the orchestral works of **Primous Fountain**, a composer and Black American with an over 50-year career in orchestral composition. Mr. Fountain's orchestral works, which include nine symphonies and numerous other Orchestral compositions are distinctive and profound contributions to the orchestral repertoire, earning support from musical legends such as the late **Quincy Jones**, who commissioned his Second Symphony and has endorsed him as "He is the future."

In 2020, Mr. Fountain was approached by Michael Tilson Thomas (MTT), Artistic Director of the New World Symphony (NWS), with a proposal to present a concert exclusively dedicated to Mr. Fountain's orchestral music. Over the next two years, the Plaintiff collaborated with MTT and NWS on detailed planning. Considering their repeated confirmations and institutional credibility, Mr. Fountain prepared and delivered 14 full-format orchestral scores, comprising over two thousand pages, formatted for performance and created at his own expense. These scores were accepted, reviewed, and included in the promotional planning of a concert titled "Primous Fountain: An American Original."

The Plaintiff understood this concert to be a performance and a rare recognition of his work within a historically exclusionary industry. The concert also carried deep personal and professional meaning. It was positioned to be a significant career milestone and, notably, it would have honoured the lifelong mentorship and support of **Quincy Jones**, whose direct involvement in Mr. Fountain's career included a long phone call proposing a 15-city U.S. symphony orchestra tour exclusively of Mr. Fountain's symphonies, and a meeting in Switzerland to discuss producing this concert tour- a groundbreaking new venture for Mr. Jones, and potentially transformative for the Plaintiff. (See **Annexure K**)

Without cause or explanation, the Defendants silently cancelled the concert, never issued a public notice, and refused to return the orchestral scores. Despite multiple follow-ups, the Plaintiff received only a vague acknowledgment that the "full concert" was no longer going forward. This breach of trust and contract is not merely negligent; it reflects a broader cultural pattern: a denial of visibility, opportunity, and restitution for Black Americans in American classical institutions.

The **failure to return the orchestral materials**, while perhaps not explicitly requested, is highly significant. As stated in the Plaintiff's legal analysis:

"*It is customary within the professional orchestral community that if a performance is cancelled, scores of this nature—mainly when provided at the expense and effort of the composer—are returned as a matter of professional courtesy. The failure to return them under the circumstances of this case could support an inference of intentional retention to avoid acknowledging cancellation or breach. In context, the refusal or neglect to return these materials may be interpreted as further evidence of the Defendants' efforts to avoid legal accountability and obscure the agreement's existence.*"

This Complaint is not simply about a performance that did not occur. It is about the **loss of a once-in-a-lifetime opportunity**, disregarding **a binding agreement**, the **cultural silencing of a significant voice**, and the **strategic withholding of materials and acknowledgment** by those in positions of institutional power.

The Plaintiff seeks recognition of this breach, compensatory and punitive damages, and a public record of the injustice. He further seeks relief not only for himself but to shine a light on the structural inequities plaguing American musical institutions — and reclaim the wrongfully denied legacy.

## II. JURISDICTION AND VENUE

1. This Court has **subject matter jurisdiction** over this action pursuant to **28 U.S.Code § 1331**, as Plaintiff asserts claims arising under federal law, including but not limited to:

   o **42 U.S.Code § 1981** (racial discrimination in contracting),
   o **15 U.S.Code § 1125(a)** (false advertising under the Lanham Act), and
   o **17 U.S.Code § 501 et seq.** (copyright infringement).

2. The Court has supplemental jurisdiction over the Plaintiff's state law claims, which include breach of contract, conversion, and unjust enrichment, pursuant to 28 U.S.C. § 1367(a), as these claims arise from the same nucleus of operative fact as the federal claims.

3. **Venue is proper** in this judicial district pursuant to **28 U.S.C. § 1391(b)(1) and (2)** because:

   o A substantial part of the events or omissions giving rise to the claims occurred in this district;
   o Defendants, including the **New World Symphony, Inc.,** are domiciled and maintain their principal offices in **Miami Beach, Florida;**
   o Defendants **Michael Tilson Thomas** and **Martin Sher** conduct business in this district and act in furtherance of the agreement here.
   o *Defendants Michael Tilson Thomas and Martin Sher (who, at all times relevant to this Complaint, conducted business in this district as Senior Vice President for Artistic Planning and Programs at the New World Symphony) engaged in conduct giving rise to Plaintiff's claims within the Southern District of Florida. Sher's subsequent employment with the Detroit Symphony Orchestra does not alter jurisdiction, as the alleged acts or omissions occurred while he was an agent of the New World Symphony in Florida.*

4. Defendants are subject to **personal jurisdiction** in this district because they purposefully availed themselves of the privileges of conducting business here and engaged in conduct that gave rise to Plaintiff's claims within the **Southern District of Florida.**

## III. PARTIES

5.  **Plaintiff Primus Fountain is a renowned American composer** currently residing in the State of **Wisconsin**. With a career spanning over five decades, Mr. Fountain is one of the few living Black American symphonic composers. "Is highly possible the only living or passed American composer whose works include **nine symphonies**, numerous orchestral suites, choral compositions, and chamber works. He is internationally recognized for his contributions to classical music and has been awarded **two Guggenheim Fellowships**. His work has been supported and championed by iconic cultural figures, including the late **Quincy Jones**, who commissioned Mr. Fountain's Second Symphony and described him as "he is the future."

6.  **Defendant Michael Tilson Thomas,** during the 2 years, was the **Music Director of the New World Symphony,** now **Artistic Director Laureate of the New World Symphony**. He was actively engaged in artistic and programming leadership at NWS at all times relevant to this Complaint. He is a resident of the **State of Florida**. Mr. Thomas initiated the concert proposal at the heart of this Complaint, directly communicated with Plaintiff, and oversaw the planning and repertoire development for what was to be a landmark concert dedicated solely to Plaintiff's orchestral works.

7.  **Defendant, New World Symphony, Inc.,** is a Florida-based nonprofit orchestral academy with its principal place of business located at **500 17th Street, Miami Beach, Florida 33139**. The institution describes itself as "America's Orchestral Academy" and operates as a prestigious platform for training emerging classical musicians. At all times relevant, NWS acted through its authorized agents, including MTT and Martin Sher, in connection with the agreement made with the Plaintiff.

8.  **Defendant Martin Sher served as the Senior Vice President for Artistic Planning and Programs at the New World Symphony at all times relevant to this Complaint. He is now Vice President and Chief Artistic & Operating Officer of the Detroit Symphony Orchestra (DSO), with business offices at the Max M. & Marjorie S. Fisher Music Center, 3711 Woodward Avenue, Detroit, MI 48201. Sher's liability arises from his actions and omissions while acting as an agent of the New World Symphony in Florida. He was a resident of Florida. Mr. Sher served as a principal liaison between the Plaintiff and MTT** and was actively involved in the logistics, communications, and final coordination of the concert project. He directly corresponded

with the Plaintiff throughout the planning phase and played a critical role in the subsequent failure to fulfill the agreement. Notably, at no point did Mr. Sher or any representative of the Defendants formally cancel the concert; instead, communications ceased without explanation, leaving the concert in an indefinite state of postponement, effectively unfulfilled to date.

# IV. FACTUAL ALLEGATIONS

## A. Formation of the Agreement

9. Plaintiff **Primous Fountain** is an American composer, Black American, and recipient of two Guggenheim Fellowships. He has composed **nine symphonies** and over **twenty-one major orchestral works** over the course of a fifty-year career. His compositions have been performed in Europe but have **not been performed in the United States in over 40 years,** despite critical acclaim and international support. Born and raised in Chicago's South Side **Ida B. Wells Housing Projects,** composing music has been his life's work and sole professional endeavor since leaving high school.

10. In **January 2020**, Plaintiff **Primous Fountain** entered into a **legally binding agreement**—express, implied, and oral—with **Michael Tilson Thomas** (MTT) and the **New World Symphony (NWS)**. This agreement was explicit in its purpose: to present a full concert dedicated **exclusively** to Mr. Fountain's orchestral compositions, which Mr. Thomas and The New World Symphony (NWS) titled **"Primous Fountain: An American Original."**

11. On **June 22, 2020**, MTT called the Plaintiff personally. During this phone call, he expressed great excitement over the originality of Fountain's music and offered to **conduct a concert comprised entirely of his works**. The plaintiff accepted this offer. (See **Annexure B**.)

12. The concert was formally **scheduled for April 16, 2022**, and publicly announced as part of the NWS **2021–2022 season**. This announcement was made both internally and to the public, and it clearly communicated that the program would feature **only**Primous Fountain's music. (See **Annexure A**.)

13. The agreement included **consideration from both parties**: Mr. Fountain would provide original orchestral scores, meticulously prepared for live performance, and grant the New World Symphony the right to use his intellectual property for the exclusive concert. In return, under a barter -style agreement, the New World Symphony and Michael Tilson Thomas

committed to publicly presenting and performing Fountain's compositions under Thomas's direction. This mutual exchange of non-monetary value also implicitly included the associated benefits of professional exposure, reputational recognition, and potential opportunities for further engagement.

14. The parties engaged in extensive communication and planning over a two-year period. At the request of MTT and NWS, Plaintiff prepared, printed, and mailed full conductor's scores of over a dozen of his orchestral works for performance. Preparation included reviewing and formatting each score meticulously over weeks, often working through the night, to ensure they were performance-ready. The scores provided included: Symphony 8, Symphony 7, Symphony 6, Symphony 5, Symphony 4, Symphony 3, Symphony 2, Symphony 1, Cello Concerto, Caprice, Manifestation, Espiritu, Exiled, String Orchestra, and Ritual Dances of the Amaks. Some works, such as Symphony No. 8, exceeded 463 pages. (See Annexure G.)

## B. The Planning Period and Promotional Commitments

14. Following the June 2020 agreement, the concert planning between Plaintiff and Defendants progressed actively over the course of nearly two years. All communications affirmed the intent to present a **full concert dedicated exclusively to Fountain's works**, scheduled for **April 16, 2022,** at the New World Center in Miami Beach, Florida.

15. As part of this planning, Plaintiff engaged in substantial and sustained correspondence with **Michael Tilson Thomas**, **Martin Sher**, and other members of the NWS team. These communications included repertoire selection, formatting instructions, and performance logistics. At every step, Plaintiff was treated as the concert's central artistic figure and was led to believe the performance would proceed as agreed.

16. On October 28, 2020, Plaintiff was instructed to prepare large-format performance conductor scores, from which individual musicians' parts could be extracted. By early 2021, Plaintiff had compiled, printed, and mailed 15 complete orchestral works, including Symphonies 1–8, a Cello Concerto, Ritual Dances of the Amaks, and additional large-scale compositions. The printed scores for some symphonies exceeded 400 pages, in 11x17 format, and were formatted specifically for MTT and the NWS orchestra. Only one chamber work—a piano solo piece—was sent separately.

17. In a June 9, 2021, email from **Martha Levine**, then administrative staff at NWS, Plaintiff's contributions were acknowledged with the recognition of "hundreds of hours" of labor invested in score preparation and formatting. Ms. Levine, who had been keeping in communication with Plaintiff as Mr. Thomas had indicated she would remain in close contact with him, further underscored the level of effort and professional commitment Plaintiff had made in preparing for the concert. (**See Annexure G.**)

18. The Defendants issued **public announcements and promotional materials** confirming the concert. In their season preview, and on their website, the concert was listed under the title: *"Primous Fountain: An American Original"*

19. Additionally, in a July **23, 2021 email**, Martin **Sher wrote** *"We are so thrilled to be working with you for this concert."* This language, along with references to the concert in internal scheduling documents, further confirmed the parties' intent to fulfill the agreement. (See **Annexure E.**)

20. These actions collectively formed a pattern of ongoing performance. The plaintiff's planning, scheduling, promotional publication, and delivery of scores show that both parties were actively executing the agreement. Under established legal doctrine, this conduct—coupled with public reliance and tangible preparations—further establishes a contract under Florida law and supports enforceability under federal contract principles.

## C. Quincy Jones's Role and the Lost Legacy

21. The concert "**Primous Fountain: An American Original**" carried not only contractual and artistic significance but also profound **personal and cultural meaning** for the Plaintiff and the society as a whole. It was envisioned, in large part, as a public tribute to the legacy and mentorship of the late **Quincy Jones**, whose support of Fountain spanned decades.

22. Quincy Jones first encountered Fountain's work when the Plaintiff was a teenager living in the **Ida B. Wells Housing Projects** of Chicago. After reading a handwritten orchestral score titled *Manifestation*, Jones immediately recognized Fountain's genius, calling him "the future." He provided **financial support**, mentorship, and encouragement for Fountain to pursue composition full-time, effectively becoming his **patron for many years and advocate**.

23. Jones later **commissioned Fountain's Second Symphony** and remained actively engaged in his development as a serious symphonic composer. Their relationship was not limited to sporadic gestures—it was deeply formative and sustained. (See **Annexure F.**)

24. At one point, Mr. Jones phoned the Plaintiff to propose organizing a **15-city U.S. orchestral tour** dedicated entirely to performing Fountain's music. This was followed by a **personal meeting in Switzerland,** where the two met to discuss further Jones producing the concert tour – a new venture for Jones.

25. The NWS concert, if performed, could have rekindled this opportunity. Its success, visibility, and critical reception might have led Jones to produce the long-discussed recording of Fountain's symphonic works—a move that would have been **historically groundbreaking** for both men and the classical music industry.

26. In fact, **Quincy Jones and Qwest TV** entered into discussions and preliminary collaboration with NWS directly in anticipation of this concert. That partnership with Qwest TV was built on the **novelty and cultural significance** of performing an entire concert of Fountain's music. (See Annexure K)

27. However, while Defendants went on to **benefit from the association** with Quincy Jones and Qwest TV for other institutional projects, they **quietly abandoned** the very concert that motivated the partnership in the first place. In doing so, they retained the prestige and capital from the Jones Association while **excluding** the artist to whom it was owed. (See Annexure L)

28. When Quincy Jones passed away in 2023, Fountain and Jones permanently lost the opportunity to publicly celebrate their legacy together. Had the concert proceeded as agreed, it could have led to a public acknowledgment of Jones's decades-long investment in Fountain's career and possibly launched the recording and recognition Jones had long envisioned for the Plaintiff. It would have greatly benefitted the Plaintiff's career and future opportunities, while also serving as a public expression of his appreciation for all the support and mentorship Jones had extended to him.

29. Instead, the Defendants' silence, dismissal, and failure to follow through on the agreement **denied Mr. Fountain a tribute** to his mentor and **deprived Mr. Jones of realizing** his belief in Fountain's musical genius—a loss compounded by Jones's passing.

30. Defendants' conduct amounts to **unjust enrichment**. They leveraged their connection to Quincy Jones to enhance their institutional reputation and programming reach while simultaneously excluding and silencing the **composer whose work** inspired and brought about that relationship. This pattern reflects a broader issue of appropriation, misrepresentation, and systemic racial disregard.

## D. Fraudulent Postponement and Public Misrepresentation

31. At some point in 2022, despite two years of planning and extensive material submission by the Plaintiff, the Defendants silently removed the April 16, 2022, concert "Primous Fountain: An American Original" from the NWS performance calendar. The exact timing of this removal is uncertain, but it is believed to have occurred around the time of the May 9, 2022 email from Martin Sher. Notably, the concert may have still been listed on Michael Tilson Thomas's personal online performance schedule even after the scheduled date had passed. No public cancellation or private explanation was issued at that time.

32. Plaintiff only became aware of the removal from an email received from Martin Sher on May 9, 2022, stating, "I hope you'll be pleased to know that we are confirmed to perform Ritual Dances this coming season." This statement was disingenuous, as up until that time, all plans had solely involved the exclusive concert dedicated to the Plaintiff's music. The email arrived abruptly, with no explanation, and suggested an entirely unrelated concert titled "Spanish Dances," which was later scheduled for December 10, 2022, and featured works by South American composers. The Plaintiff's concert had vanished without announcement, acknowledgment, or apology, replaced by a program with no connection to the original agreement or artistic vision. (See Annexure I)

33. In an email dated **July 23, 2021**, Defendant **Martin Sher** wrote:

*"Though we had to step away from a full concert of your music, we are still planning to include one of your works in a future program."*
This vague reference to a "step away" was the first indirect admission of cancellation—deliberately ambiguous, and lacking the transparency expected in professional orchestral programming. (See Annexure M)

34. Defendants suggested to the Plaintiff, without formal notice, that the concert might have been "postponed" due to Michael Tilson Thomas's health concerns. However, this claim proved misleading. Mr. Thomas was publicly

scheduled to, and did in fact, conduct three NWS concerts during the 2022–2023 season. This is the same season the Defendants misled Fountain to believe his concert would be rescheduled; however, his concert was not rescheduled. Instead, Mr. Thomas conducted three other concerts, disregarding his obligation to deliver and conduct the exclusive concert dedicated to the Plaintiff. (See **Annexure D**.)

35. The postponement narrative was clearly contrived. Rather than postponing Mr. Fountain's concert or assigning it to another conductor—as is standard industry practice—Defendants proceeded with unrelated programming, while continuing to **withhold Plaintiff's scores** and **issue no statement** about the cancellation.

36. This was not an oversight. It was a calculated effort to distance themselves from the agreement, **minimize public scrutiny**, and avoid acknowledging their failure to honor a historic commitment.

37. Making matters worse, even after having received the first not responded to the demand letter, the Defendants' public-facing language remained contradictory. On the NWS website, the Plaintiff was still referred to as:

> Defendants publicly stated *"Primous Fountain – longtime friend and collaborator of MTT"*—despite no collaboration being realized, and the only planned concert had been canceled. (See **Annexure J**.) While Thomas had conducted a work of Fountain's in 1977 with a different orchestra, there had been no contact between them from that time until 2020. This proclamation was misleading, as the Defendants' behavior demonstrated clearly that no friendship or longstanding collaboration existed. There was no present collaboration realized, and the only concert that had been agreed upon was ultimately not performed.

38. When coupled with these misleading communications, The refusal to return the orchestral scores further reinforces the inference of willful misconduct. As noted in the Plaintiff's own legal review:

*"The failure to return [scores] under the circumstances of this case could support an inference of intentional retention to avoid acknowledging cancellation or breach… [and] may be interpreted as further evidence of the Defendants' efforts to avoid legal accountability and to obscure the existence of the agreement."*

39. Plaintiff sent two formal demand letters via certified mail to all Defendants, explicitly outlining the breach and requesting restitution. Defendants failed to respond to either communication. This silence evidence willful disregard

of contractual obligations and reinforces the pattern of intentional misconduct alleged herein. (See Annexures N, R, S)

40. These actions collectively reflect a pattern of intentional and willful misrepresentation. The Defendants' conduct—including vague claims of postponement, conflicting public statements, and silent program substitutions—was aimed at deflecting responsibility, obscuring the truth, and suppressing the Plaintiff's voice, legacy, and legal standing.

## E. Contractual Breach and Withholding of Materials

41. The Plaintiff entirely performed under the agreement by delivering to the Defendants a complete set of fourteen (14) full orchestral scores, formatted at the Defendants' request and printed in professional 11x17 conductor format, along with one solo work titled Piano Solo. These materials included the Plaintiff's Symphonies Nos. 1 through 8, Manifestation, Ritual Dances of the Amaks, Caprice, Espiritu, and Exile. The Piano Solo work was also scheduled for performance alongside the orchestral works in the exclusive concert. Additionally, the concert was to include a filmed performance by the Dance Theatre of Harlem of their ballet "Manifestations," choreographed by the late Arthur Mitchell to Fountain's orchestral work Manifestation, as well as the showing of a video conversation between Thomas and Fountain.

42. Per their request, the New World Symphony and Michael Tilson Thomas received these scores physically. They were not digital mockups or reference drafts but fully realized, conductor-ready scores, representing **hundreds of hours of labor** and significant personal financial investment.

43. Once Defendants received these scores, they continued concert planning for up to two years, reinforcing that performance was imminent. Plaintiff's name remained in internal programming notes and season previews, confirming both **intent and reliance** by the Defendants.

44. Upon Defendants' quiet cancellation of the concert, **no effort was made to return the scores**, despite industry-standard practice requiring the return of original materials when a performance is canceled.

45. No request was made by the Plaintiff for the return of his property. The materials remain in the Defendants' possession to this day.

46. This continued possession of the scores, coupled with the cancellation, constitutes not just **a breach of contract** but **conversion**—an unlawful exercise of control over Plaintiff's tangible personal property.

47. As discussed in the Plaintiff's legal analysis, the failure to return these scores under these specific circumstances supports a **reasonable inference of intentional retention**:

> "...*to avoid acknowledging cancellation or breach... and to obscure the existence of the agreement.*"

48. In doing so, Defendants deprived Plaintiff of his contractual right to performance and temporarily hindered his ability to repurpose or license his own works elsewhere, as the only performance-ready copies, formatted and printed to the specifications requested by the Defendants, remain held by them. While new copies can be produced, the cost of printing one page of 11x17 score paper is $0.52 per page, representing a significant expense given the large number of pages involved in each orchestral score.

49. Plaintiff notes that although replacement copies of the materials can be produced, doing so would require substantial financial and logistical effort due to the formatting and printing standards required for orchestral performance.

50. Given this, Plaintiff contends that the continued possession of the original materials by Defendants, without consent or return, represents an unreasonable and burdensome interference with his rights as a composer and copyright holder.

51. Moreover, by continuing to hold Plaintiff's intellectual property while providing no clarification about its status or future use, the Defendants exacerbated the harm, **obstructing future opportunities**, suppressing the visibility of Plaintiff's work, and undermining Plaintiff's ability to assert control over his artistic output.

52. Defendants' conduct, in sum, constitutes a **material breach of the parties' agreement**, a **failure of restitution**, and an **intentional violation of the Plaintiff's rights to his property**.

## F. Racial Discrimination and Historical Underrepresentation

53. The conduct of Defendants—namely, the quiet cancellation of a fully planned, fully-promoted, and fully-prepared concert featuring the works of a living Black American who is a composer, without explanation, public

notice, restitution, or rescheduling—must be viewed within the larger context of systemic exclusion of Black Americans who are composers in the American classical music industry.

While the term "Black composers" is standard, its usage often contributes to marginalization, subtly relegating Black Americans' contributions to the periphery. This mirrors a similar pattern in the popular music industry, where phrases such as "Black music" have historically served to label, and in effect diminish, the creative ownership of Black Americans over the very genres they originated.

In reality, all modern popular music genres—soul, R&B (rhythm and blues), hip hop, gospel, blues, rock and roll, house, country, punk, trance, and jazz—trace their roots to the musical traditions developed by enslaved Africans in the United States. These genres evolved over centuries of cultural expression, resistance, and innovation. The misappropriation of these genres by white musicians, often with rebranding—such as the transformation of "shake, rattle and roll" into "rock and roll"—has perpetuated the erasure of Black authorship in music history.

What is now known globally as pop music is, in essence, the folk music of Black Americans. The contributions of Black Americans in both classical and popular music deserve accurate recognition and full inclusion, without dilution or distortion.

54. Black composers constitute **less than 0.5%** of those performed in major American symphony halls. In most professional orchestras, it is not uncommon for **there to be zero Black full-time musicians**, nor for a single program in a season to include works by a Black composer.

55. The Plaintiff, **Primous Fountain**, has not had his orchestral works performed in the United States for **over 40 years**, despite having composed nine symphonies and receiving international critical acclaim. This is not due to lack of merit. Reviews of his music have drawn comparisons to the complexity and brilliance of **Stravinsky, Prokofiev, and Bartók**. A 1980 review in the *Buffalo Courier Express* stated: "**Fountain takes off where Stravinsky finished.**"

56. In this historical climate, the planned concert by the New World Symphony was not just a professional opportunity—it was a historic corrective. A concert exclusively featuring Fountain's orchestral works, performed by a major American orchestra and conducted by MTT, would have been the first of its kind in recent U.S. history. Such a concert, centered entirely on the music of a single composer—a rarity in itself—would have publicly acknowledged Fountain as an American original and an American treasure.

The involvement and sponsorship of Quincy Jones would have further elevated the event, making it a moment of profound cultural significance and historic importance.

57. The Plaintiff was promised not token representation, but center stage—an entire evening of works bearing his name, reputation, and legacy. The public announcement, entitled **"Primous Fountain: An American Original,"** reinforced this promise. That promise was never fulfilled.

58. Instead, when the concert was quietly removed, the Defendants **minimized Plaintiff's presence** by shifting from a complete program to including **only one-third** of a single movement from one of his works in a different, unrelated concert titled **"Spanish Dances"**—a concert featuring entirely South American composers. Without Plaintiff's input or consent, this unilateral reclassification amounted to **cultural erasure**. (See Annexure I)

59. Not only was the piece miscontextualized, but after receiving the Plaintiff's first demand letter, even that excerpt was removed from the program and quietly shuffled into another concert—again without attribution, collaboration, or public notice. These actions demonstrate a **deliberate effort to obscure Plaintiff's contribution**, rather than honor it.

60. The handling of the Plaintiff's work stands in contrast to the continued **privileging of non-Black composers** within the NWS programming structure. No full-time Black American musician was hired during Michael Tilson Thomas's 25-year tenure as music director of the San Francisco Symphony. As of 2024, the number of Black musicians in that orchestra has increased—marginally—to only **one**.

61. The **discriminatory exclusion** of the Plaintiff in this case was not passive; it was operational. The plaintiff was offered a central platform. He performed. He delivered. Then he was silently erased.

62. Plaintiff was replaced, diminished, and displaced—not due to artistic merit, health reasons, or administrative error, but through **intentional misdirection** that aligns with a longstanding pattern of racialized suppression in elite musical institutions.

63. Defendants' conduct, including:

- the abrupt program change;

- the concealment of cancellation;

- the strategic retention of Plaintiff's property;

- and the false public narrative of continued collaboration—reflects a willful refusal to treat the Plaintiff on **equal contractual and professional footing** with similarly situated non-Black composers (or, alternatively phrased, composers who are white).

64. Under **42 U.S.C. § 1981**, Plaintiff asserts that he was denied **"the same right… to make and enforce contracts… as is enjoyed by white citizens"**. The conduct of the Defendants—taken together—reflects a **denial of performance**, a **withholding of economic opportunity**, and a **refusal to acknowledge harm**, all on the basis of race.

65. Plaintiff asserts that the cancellation, silence, exclusion, and appropriation at the center of this complaint cannot be viewed merely as a breach or oversight but must also be recognized as a form of **racial discrimination in contracting**, in violation of federal law.

# G. Diminishment, Diversion, and Misuse of Works

66. Following the cancellation of the concert "Primous Fountain: An American Original," Defendants unilaterally altered the scope of the Plaintiff's participation without notice or consent. Instead of fulfilling the agreed commitment to feature an entire program of his works, Defendants inserted **only one-third** of a single movement of *Ritual Dances of the Amaks* into a different concert titled **"Spanish Dances."** (See Annexure I)

67. This concert bore no connection to the Plaintiff's heritage, compositional style, or geographic origin. It featured works by South American composers and was thematically inconsistent with Mr. Fountain's identity as a Black American composer. The plaintiff's work has absolutely no relationship to Spanish music or Spanish dances. Including his excerpted work in that program was not only a distortion of the agreement but also an act of cultural misplacement and minimization, reasonably suggesting nefarious intent based on how the substitution was handled that the cancellation, silence, exclusion, and appropriation at the center of this complaint cannot be viewed merely as a breach or oversight but must also be recognized as a form of racial discrimination in contracting, in violation of federal law.

68. Upon receiving the Plaintiff's first **formal demand letter**, which the Defendants never responded to, the Defendants removed the Plaintiff's name and the partial work from that concert program without explanation. They

then quietly inserted the same excerpt into a later program with similarly diluted visibility, **without any public acknowledgment**, apology, or explanation to the Plaintiff. At the same time ignored the demand letter received.

69. These actions were neither accidental nor benign. They represented a deliberate attempt to:

- **Avoid accountability** for cancelling the exclusive concert;

- **Misappropriate portions** of the Plaintiff's work without honoring his full artistic vision;

- **Protect institutional credibility** while quietly sidelining a historically marginalized voice.

70. In addition to the programming decisions, Defendants continued to publicly describe Plaintiff as a "**longtime friend and collaborator of MTT**," creating the false appearance that the collaboration had occurred when, in fact, the promised performance had been **erased**, and the Plaintiff had been **excluded without explanation**. (See **Annexure J.**)

71. These misrepresentations violate the trust and integrity inherent in public artistic programming, particularly when involving living composers whose work is being commodified and framed in public discourse.

72. Moreover, the substitution of one-third of a work into a thematically unrelated concert violated the **clear understanding between parties** that Plaintiff's work would be presented in its full scope and in context. The failure to honor this understanding constitutes a **material alteration of the agreement**, and supports both a **breach of contract** and a **false designation of origin** claim under federal law.

73. The **unauthorized use of a portion** of Plaintiff's composition in unrelated programming diluted the integrity of the original work, diminished its perceived significance, and deprived Plaintiff of the meaningful recognition and audience engagement that a dedicated concert would have provided.

74. Defendants' pattern of minimizing the Plaintiff's presence while **continuing to benefit** from institutional diversity narratives and their association with Quincy Jones constitutes **misuse of artistic property**, **unjust enrichment**, and a **continued campaign of reputational harm**.

# H. False Advertising Under 15 U.S.C. § 1125

75. Under **15 U.S.C. § 1125(a)** (Lanham Act), it is unlawful for any person or entity, in commercial advertising or promotion, to make **false or misleading representations of fact** that misrepresent the nature, characteristics, or origin of goods, services, or commercial activities. The Defendants' actions fall squarely within this statutory violation.

76. In 2021 and 2022, the New World Symphony (NWS) and Michael Tilson Thomas publicly announced and widely promoted a concert titled: **"Primous Fountain: An American Original"**

77. The concert was marketed as a **landmark event**, described in press materials and internal communications as a program that would feature the orchestral works of Mr. Fountain exclusively. These announcements appeared on **NWS's official website**, in email campaigns, and in season subscription materials. (See **Annexure A.**)

78. These public promotions led both the general public and the artistic community to believe that the Plaintiff's works would be performed in full, and that the concert was a confirmed engagement, not merely a possibility or proposal.

79. Despite this extensive promotion, the concert was **never performed**, and the Defendants **never issued a formal or informal cancellation notice** to the public or the Plaintiff. This silence left colleagues, sponsors, and audiences confused and misinformed about the event's cancellation, with some assuming that the Plaintiff was responsible for the failure to perform.

80. Following the concert's quiet removal from the calendar, Defendants continued to reference the Plaintiff in promotional language—describing him as a "**longtime friend and collaborator of MTT**"—despite no such collaboration being realized. These statements created a **false impression of association and fulfillment**. (See **Annexure J.**)

81. The concert announcement was used to **bolster the public image of the Defendants**, attract audience interest, and strengthen diversity narratives at a time when major institutions faced increasing public scrutiny over the lack of representation of Blacksas composers and musicians.

82. By failing to perform the concert, by repurposing the Plaintiff's name and reputation without actual performance, and by continuing to promote vague associations with the Plaintiff's name and legacy, Defendants **misled the public, donors, and artistic collaborators**.

83. These actions had direct and measurable consequences:
   - The Plaintiff's **reputation suffered**, as no public explanation was given;

   - Audiences and professional peers wrongly assumed **the performance had occurred**;

   - The Plaintiff was denied the **visibility, credit, historic significant, and career momentum** associated with this orchestral concert exclusively of his works.

84. These representations meet the threshold for **false and misleading statements in commercial promotion**, as outlined in 15 U.S.C. § 1125(a), and constitute a **deceptive commercial practice** that harmed the Plaintiff's standing, visibility, and income potential.

85. Plaintiff, therefore, seeks compensatory and statutory damages for false designation of origin, misrepresentation, and reputational harm in accordance with the Lanham Act and other applicable federal and state laws.

# I. Copyright Infringement Under 17 U.S.C. § 501

86. The Plaintiff is the sole author and copyright owner of all orchestral compositions referenced in this Complaint, including but not limited to **Symphonies Nos. 1–8**, *Caprice, Espiritu, Exile, Manifestation, Ritual Dances of the Amaks*, and *Cello Concerto*. These compositions were created, developed, and completed solely by the Plaintiff and are protected under **Title 17 of the United States Code**, including Sections **102, 106, and 501**.

87. Plaintiff granted the Defendants **limited, conditional permission** to perform these works solely in the context of a **single concert event** entitled *"Primous Fountain: An American Original,"* featuring exclusively his music, to be conducted by MTT and promoted as such.

88. The license granted by Plaintiff was **specific in scope**. Any use of the compositions outside of the agreed-upon full-concert context was expressly prohibited. This condition was further **communicated in writing** when the Plaintiff, after learning of the concert's removal, notified the Defendants via email that no part of his music was authorized for performance unless presented in the original exclusive context. (See **Annexure P.**)

89. Despite this express revocation of permission, **Martin Sher** requested orchestral performance parts from Plaintiff multiple times. While Plaintiff

declined to provide those parts, the Defendants retained **complete conductor's scores** from which such parts could easily be extracted and performed without Plaintiff's knowledge.

90. While Plaintiff has no direct confirmation that unauthorized performances occurred, the inclusion of Plaintiff's name and partial works in multiple concert schedules—**including the "Spanish Dances" program**—and their abrupt removal without explanation, suggests that Defendants either:

- **Scheduled and rehearsed** portions of Plaintiff's copyrighted works without permission; or
- **Used his name and content** in public advertising without lawful authorization or licensing.

91. Such acts, if they occurred, would constitute **copyright infringement** under **17 U.S.C. § 501**, violating the Plaintiff's exclusive rights to reproduction, public performance, and distribution.

92. Even the threat of such unauthorized use, coupled with continued possession of the scores and misleading public promotions, gives rise to injunctive relief. However, Plaintiff has not demanded the return of the physical scores prior to initiating this action, as he remains open to injunctive relief in the form of a court-ordered exclusive performance of his works. Nonetheless, if such performance is not ordered, Plaintiff seeks the immediate return of all materials and a permanent injunction prohibiting any further use of his works without a valid license.

93. The damage from any infringement would be substantial. Plaintiff's compositions are rare, valuable, and unperformed in the U.S. for over four decades. Unauthorized use would compromise the **exclusivity, artistic control, and commercial value** of future performances and licensing opportunities.

94. Pursuant to the **Copyright Act of 1976**, Plaintiff seeks:

- **Statutory damages** for any unauthorized use;

- In the event specific performance is not ordered by the Court, Plaintiff further requests the return of all copies and score materials in Defendants' possession as part of the equitable relief sought;

- **Attorneys' fees and costs;**

- And such other relief as the Court deems just under **17 U.S.C. § 504 and § 505**.

# V. CLAIMS FOR RELIEF

## Count I – Breach of Contract
*(Against all Defendants)*

95. Plaintiff repeats and re-alleges Paragraphs 1 through 92 as though fully set forth herein.

96. A valid and enforceable agreement existed between Plaintiff and Defendants for the presentation of a concert titled *"Primous Fountain: An American Original"*, to be performed exclusively by the New World Symphony under the direction of Michael Tilson Thomas and featuring exclusively Plaintiff's orchestral compositions.

97. The agreement was entered into through mutual assent, supported by consideration, including:
    (a) The Plaintiff's provision of 14 conductor-ready orchestral scores,
    (b) formatting and labor performed at the request of Defendants,
    (c) mutual reliance and performance over a two-year period, and
    (d) public and internal promotion of the concert by the Defendants.

98. Plaintiff fully performed his obligations under the agreement, including delivering scores and complying with all artistic and logistical requirements set forth by Defendants.

99. Defendants materially breached the agreement by:
    - Unilaterally cancelling the concert without notice, explanation, or opportunity to cure;
    - Failing to return the Plaintiff's scores;
    - Refusing to engage in a substitute performance or rescheduling;
    - Misusing the Plaintiff's name and work in unrelated contexts.

100. As a result of the Defendants' breach, Plaintiff has suffered substantial damages, including:
    - Loss of performance opportunity;
    - Reputational harm;
    - Financial costs associated with score preparation;
    - Missed opportunities for future For future performances, commissions, recordings, and sponsorship
    - Loss of vast opportunities that could have resulted from and with, and even most importantly afterward, with Quincy Jones, who, along with his Qwest TV, was taken active participation towards the development of the concert.

101.  Plaintiff seeks compensatory damages, restitution, and such other equitable relief as the Court deems just and proper.

## Count II – Racial Discrimination in Contracting (42 U.S.C. § 1981)
*(Against all Defendants)*

102.  Plaintiff repeats and re-alleges Paragraphs 1 through 99 as thoughtfully set forth herein.

103.  Under 42 U.S.C. § 1981, all persons within the United States shall have the same right to make and enforce contracts as is enjoyed by white citizens.

104.  Plaintiff, a Black American and composer, was denied the right to enforce the contract on equal terms as similarly situated non-Black composers.

105.  Defendants entered into a binding agreement with Plaintiff, accepted and promoted his works, and then failed to honor their commitment—cancelling the concert without explanation, concealing the breach, and refusing return or redress.

106.  Defendants continued to present themselves publicly as having a relationship with Plaintiff, while minimizing his artistic contribution and depriving him of professional credit.

107.  The denial of contract performance, failure to return property, and concealment of breach reflect a pattern of conduct that disproportionately affects Black artists in orchestral programming and were committed with discriminatory intent or willful disregard of the Plaintiff's rights.

108.  Defendants' conduct violated Plaintiff's rights under 42 U.S.C. § 1981, causing direct and ongoing harm.

109.  Plaintiff seeks compensatory and punitive damages, attorneys' fees, and declaratory and injunctive relief as permitted by law.

## Count III – False Advertising and False Designation of Origin
*(Under 15 U.S.C. § 1125(a); Against all Defendants)*

Plaintiff repeats and re-alleges Paragraphs 1 through 107 as though fully set forth herein.

110.  Under the **Lanham Act (15 U.S.C. § 1125(a))**, it is unlawful for a party, in commercial advertising or promotion, to misrepresent the nature,

characteristics, or origin of goods, services, or commercial activities.

111.   Defendants, by publicly promoting the concert *"Primous Fountain: An American Original"*, misrepresented that such a performance was scheduled and would occur, and used Plaintiff's name, reputation, and work to enhance their own credibility and programming visibility.

112.   These promotional representations were materially misleading to:

- The general public;

- Concert subscribers;

- Collaborators such as Qwest TV and Quincy Jones;

- And professional peers within the classical music and orchestral communities.

113.   Defendants never issued a cancellation notice, correction, or public explanation after the concert was removed, and continued to imply collaboration with Plaintiff in subsequent materials.

114.   These acts constitute **false advertising**, **false endorsement**, and **false designation of origin** under § 1125(a), causing Plaintiff reputational injury, lost opportunity, and public confusion regarding the nature of his involvement with the Defendants.

**The plaintiff is entitled to:**

- Actual and statutory damages;

- Disgorgement of any commercial benefit obtained from misuse of his name and reputation;

- Injunctive relief;

- Attorneys' fees and litigation costs.

**Count IV – Copyright Infringement**
*(Under 17 U.S.C. § 501; Against all Defendants)*

Plaintiff repeats and re-alleges Paragraphs 1 through 114 as though fully set forth herein.

115.   The plaintiff is the registered copyright holder and exclusive author of all

works provided to the Defendants in connection with the planned concert, including Symphonies 1–8 and various orchestral works

116. The plaintiff granted the Defendants a conditional license to perform his copyrighted works **only** as part of the agreed-upon concert. He later expressly revoked that permission when the concert was removed and no alternative plan was proposed.

117. Defendants retained the full orchestral scores and repeatedly requested additional parts, suggesting preparation or rehearsal of the works outside the authorized context.

118. Defendants publicly scheduled and promoted at least one performance in which an excerpt of Plaintiff's work was included without his consent and in violation of the license scope.

119. Even if no unauthorized performance occurred, the **threatened use, retention, and commercial benefit** derived from possessing and referencing the Plaintiff's copyrighted works violates the spirit and protections of **17 U.S.C. § 501 et seq.**

**Plaintiff seeks:**
- Injunctive relief;

- Return of all physical and digital copies;

- Statutory and/or actual damages;

- Attorneys' fees and any other relief authorized under **Sections 504–505** of the Copyright Act.

**Count V – Conversion and Unjust Enrichment**
*(Under Florida Law; Against all Defendants)*

Plaintiff repeats and re-alleges Paragraphs 1 through 121 as though fully set forth herein.

120. Plaintiff delivered 14 full-format original orchestral scores to the Defendants for use in a concert. These were not promotional materials or drafts—they were performance-ready scores produced at personal expense.

121. Defendants took possession of these materials, retained them after the concert was cancelled.

122. This unauthorized retention constitutes **conversion** under Florida law: an

act of dominion or control over the property of another inconsistent with the other's rights.

123. Defendants have also been **unjustly enriched** by:

(a) Publicly promoting Plaintiff's name to enhance their reputation;

(b) Leveraging Quincy Jones and Qwest TV's involvement, obtained through association with Plaintiff,

and

(c) Retaining intellectual and physical property without compensation.

**The plaintiff is entitled to:**

- Restitution for unjust enrichment;

- Compensatory damages for conversion and property interference;

- Court costs and further equitable relief.

# VI. PRAYER FOR RELIEF

Plaintiff **Primous Fountain** respectfully seeks the following relief from this Court to redress the injuries caused by Defendants' breach of contract, discriminatory conduct, deceptive public misrepresentations, and unlawful retention of artistic property:

**A. Specific Performance**

1. **Concert Performance**: An injunction requiring the Defendants to organize and execute the concert titled *"Primous Fountain: An American Original"*, originally scheduled for April 16, 2022. The performance should:
   o Be dedicated exclusively to the orchestral compositions of Plaintiff;
   o Be conducted by **Michael Tilson Thomas**, or an equally prominent conductor or conductors, subject to Plaintiff's approval;
   o Be performed by an orchestra of equivalent professional stature to the New World Symphony;
   o Include appropriate crediting, publicity, and press exposure for Plaintiff's name, biography, and artistic legacy.

2. The performance shall be conducted at a venue of equivalent visibility, acoustics, and audience reach as the New World Center in Miami Beach, Florida, and shall be accompanied by:
   o Archival video and audio recording;
   o Press and promotional support;
   o Artist talk or legacy event curated by Plaintiff and his advisors.
3. The performance is to be for a two-day (2) concert exclusively for the Plaintiff's work.

## B. Monetary Damages *(In the alternative, or in addition to specific performance)*

1. **Organizational Costs**:

An award of damages sufficient to cover the full cost of independently producing two comparable orchestral concerts under Plaintiff's direction. These costs include:
   o Hiring of musicians for the creation of an orchestra compatible in size and quality to that of the NWS;
   o Hiring of conductor of equal prominence as Michael Tilson Thomas;
   o Rental of a suitable concert venue and rehearsal facilities;
   o Travel, accommodation, and per diem for musicians and technical staff;
   o Professional recording, videography, marketing, and press outreach;
   o Administrative assistance and event management services.
*(A budget estimate for such a production, based on similarly scaled orchestras, is attached hereto as Annexure Q.)*

2. **Compensatory Damages**:

For lost artistic, commercial, and cultural opportunities, including:
   o Revenue anticipated from a proposed **15-city orchestral tour** that would have followed the original concert;
   o Sponsorship and grant opportunities that were in development at the time of the concert announcement;
   o Long-term financial and institutional losses tied to the failure to reintroduce Plaintiff's music into the U.S. concert repertoire.

3. **Punitive Damages**:

In the amount of **$15 million**, for the Defendants' **malicious, willful, and deceitful conduct**—including fraudulent misrepresentation, racial exclusion, and reputational harm. These damages are warranted to deter

similar public art institutions' misconduct and acknowledge the intentional denial of opportunity and legacy.

4. **Emotional Distress and Reputational Harm:**

Compensation for the emotional suffering, anguish, and humiliation Plaintiff experienced due to:
- o The Defendants' sudden and silent abandonment of a long-promised public event;
- o The appropriation of his name in ongoing promotional language;
- o The irreversible loss of honoring his mentor **Quincy Jones** through this performance before Mr. Jones's passing.

*(See Annexure J: NWS promotional language continuing to refer to Plaintiff as a "longtime friend and collaborator of MTT" despite no performance ever taking place.)*

## C. Equitable and Declaratory Relief

1. A court declaration that a legally enforceable contract existed between Plaintiff and Defendants, and that Defendants materially breached it.

2. A permanent injunction barring Defendants from without Plaintiff's consent:
- o Further using, publishing, performing, or referencing Plaintiff's copyrighted works;
- o Retaining, copying, or distributing his orchestral scores in any capacity.

3. An order requiring the **immediate return of all scores and materials**, physical and digital, in the Defendants' possession.

## D. Statutory and Ancillary Relief

1. Statutory damages and/or actual damages under:
- o The **Lanham Act**, 15 U.S.C. § 1125(a);
- o The **Copyright Act**, 17 U.S.C. § 504–505;
- o 42 U.S.C. § 1981, and applicable civil rights statutes.

2. Pre-judgment and post-judgment interest, attorneys' fees, expert costs, and any other relief the Court deems just and equitable under the circumstances.

# VII. JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff **Primous Fountain** hereby **demands a trial by jury** on all issues so triable in this action, including but not limited to claims of breach of contract, racial discrimination under 42 U.S.C. § 1981, false advertising, copyright infringement, and all related claims for damages and equitable relief.

Respectfully Submitted,

*Primous Fountain*

Primous Fountain

*Pro Se*

1893 East Washington Ave, Madison, WI 53704

Dated:

October 14, 2025

### Certificate of Service

**I hereby certify** that all counsel or parties of record served a true and correct copy of the foregoing on the Service List below.

**Primous Fountain:** _____